MEMO ENDORSED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/02/2022

NES BASEBALL & SOFTBALL FACILITY, INC.,
d/b/a NORTHEAST SUPREME,

                          Plaintiff,

      -against-

NORTHEAST ANGELS SOFTBALL, LLC,
ALEXADRA YOFFEE, and JOEL YOFFEE

                          Defendants.

No. 22-cv-9158 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

Plaintiff NES Baseball & Softball Facility, Inc., d/b/a Northeast Supreme ("Plaintiff" or "NES") moves under Rule 65(a) of the Federal Rules of Civil Procedure for an order preliminarily enjoining Defendants Northeast Angels Softball LLC, Alexandra Yoffee, and Joel Yoffee ("Defendants") from, in essence, using the "Northeast Supreme," "Northeast Angels," and "NES" marks and stylized logos (collectively, "Plaintiff's Marks" or "the Marks"), over which it alleges ownership, and using trade secrets that Plaintiff alleges Defendants misappropriated.

Specifically, Plaintiff seeks a preliminary injunction restraining Defendants from:

(1) using any reproduction, counterfeit, copy, or colorable imitation of Plaintiff's unregistered marks (including the Northeast Supreme, Northeast Angels, and NES marks and stylized logos) (collectively, "Plaintiff's Marks") to identify any goods or services not authorized by Plaintiff;

(2) using any of Plaintiff's Marks or other rights or any other marks confusingly or substantially similar to Plaintiff's marks, on or in connection with Defendants'' advertising, marketing, promoting, distributing, displaying, offering for sales,

1

selling, dealing in, or otherwise participating in sporting events using goods, services, or entities bearing Plaintiff's Marks;

(3) using any false or misleading description or representation, or engaging in any commercial action which is likely to cause confusion, cause mistake and/or to deceive members of the industry and/or the public as to the affiliation, connection or association of any good or service advertised, marketed, promoted, distributed, displayed, used in a sporting event, offered for sale, or sold by Defendants with Plaintiff, and/or as to the origin, sponsorship or approval of any good or service manufactured, imported, exported, advertised, marketed, promoted, distributed, displayed, used in a sporting event, offered for sale, or sold by Defendants and Defendants' commercial activities by Plaintiff;

(4) reproducing, counterfeiting, copying, or colorably imitating Plaintiff's Marks and applying such reproductions, counterfeits, copies, or colorable imitations to digital images, labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising goods or services;

(5) effecting assignments or transfers, forming new entities or associations, or creating and/or utilizing any other platform, account, online points of advertising or sale, or any other means of advertising, marketing, promotion, distribution, display, offering for sale, for the purpose of circumventing or otherwise avoiding the prohibitions set forth in any preliminary injunction ordered by the Court in this Action;

(6) facilitating access to any or all domain names and websites through which Defendants engage in the distribution, advertising, promotion, display of Plaintiff's Marks;

(7) obtaining, using, disseminating, disclosing, or otherwise misappropriating any commercially valuable information that is confidential or otherwise not generally known, and not readily ascertainable through proper means, that was acquired, accessed, downloaded, copied, printed, transmitted, duplicated, or otherwise reproduced after June 14, 2022 through the use of Alexandra Yoffee's NES employee login credentials on eSoft Planner and any other computer systems owned or operated on behalf of NES; and

(8) knowingly instructing, aiding, or abetting any other person or business entity in engaging in any of the activities referred to [above].

The Court has carefully reviewed the parties' submissions and considered the arguments made by both parties at an in-person hearing held on November 16, 2021. (Minute Entry dated November 16, 2022.) For the following reasons, Plaintiff's application is GRANTED as to Plaintiff's requests that the Court prohibit Defendants from using Plaintiff's Marks and DENIED as to Plaintiff requests pertaining to Defendants' alleged misappropriation of Plaintiff's trade secrets.

## **FACTUAL BACKGROUND**

The following facts are taken from the parties' submissions and are undisputed unless otherwise noted. *See Park Irmat Drug Corp. v. OptumRx, Inc.* 152 F.Supp.3d 127, 132 (S.D.N.Y. 2016) ("In deciding a motion for [a] preliminary injunction, a court may consider the entire record including affidavits and other hearsay evident.")

***Plaintiff's Initial Softball Operations and Relationship with Defendants***

Plaintiff has operated a baseball and softball training facility in Chestnut Ridge, New York since November 2019. (ECF No. 6, at 7.) Those operations initially included the support, management, and training of multiple youth baseball teams. (*Id.*) Plaintiff alleges that members of

two softball teams (the "Jersey Girls") requested to join NES and receive services like those of its baseball teams, leading to the Jersey Girls joining NES in early 2020. Plaintiff further alleges that, at this time, it formally launched a softball program, which was intended to complement its baseball program. (*Id.*) However, Defendants allege that Plaintiff never acquired the Jersey Girls (ECF No. 14-4, at 6.)

Contemporaneously, Plaintiff was contacted by Defendant Joel Yoffee ("Joel" or "Defendant"), who proposed that Plaintiff's softball program hire his daughter, Defendant Alexandra Yoffee ("Alexandra" or "Defendant"), a recent college graduate who played softball at Rutgers University. (*Id.*) Plaintiff hired Alexandra and, by March 2020, formally rebranded its softball teams as the "Northeast Angels"[1] as well as launched its softball program with Alexandra as NES's Head of Softball Operations. (*Id.*) Whereas Defendant claims that Alexandra had an independent contractor relationship with Plaintiff (ECF No. at 6), Plaintiff claims that Alexandra was its employee. (ECF No. 1, at ¶ 85.). Additionally, although Plaintiff asserts that it and Alexandra worked together to create the "Northeast Angels" name and marks, (ECF No. 18, at 2) Alexandra alleges that she was their sole creator. (ECF No. 14, at 9.)

Over the course of two years, the Northeast Angels grew to seven teams, with multiple victories in tournaments and events. (ECF No. 6, at 7.) During this period, and at what Plaintiff alleges was a significant cost, Plaintiff gathered, compiled, organized, maintained, used, and protected an extensive collection of confidential customer and player information that is kept in a database on a secure computer server. (*Id.* at 8.) That database is allegedly one of Plaintiff's most

---

[1] Defendants allege that the Jersey Girls players followed Alexandra, who was their assistant coach, to NES. (ECF No. 14, at 9.) However, the then-coach of the Jersey Girls, David Fierro, states in his Declaration that he brought his Jersey Girls team into NES's softball program and that Alexandra's training was not the reason his team joined NES and became the Northeast Angels; rather, he brought his players to NES in order "to have the same positive experience that [his] son had with playing for one of NES's baseball teams." (ECF No. 20, at 1.)

valuable assets and can only be accessed via an encrypted connection through a unique password-protected account. (*Id.*)  Plaintiff claims that the confidential information in that database includes every facet of a player or client's training needs, the details about the services they have used, pricing arrangements they have received, extensive contact information, and other commercially valuable details that are allegedly essential for the maintenance and growth of the key relationships for Plaintiff's business. (*Id.*) Conversely, Defendant alleges that the database Plaintiff references was simply a "booking system," rather than a database Plaintiff compiled at significant cost. (*Id.*, at 13.)

***Defendants' Alleged Violation of Plaintiff's Trademark and Misappropriation of Trade Secret***

The relationship between Plaintiff and Alexandra began to deteriorate after April 2022, when Joel proposed that NES jointly invest with Joel and Alexandra in the construction of a new sports training facility in nearby Suffern, New York (the "Suffern facility"), which would be used for the Northeast Angels' training. (ECF No. 6, at 8.) Plaintiff declined this proposal. *(Id.)*

From April through July of 2022, Defendants Alexandra and Joel Yoffee negotiated with Plaintiff to become partners in a facility dedicated to softball, as opposed to both baseball and softball. (ECF No. 14, at 12.) Defendants claim that, during these negotiations, Plaintiff was aware of Alexandra's intention to leave Plaintiff and build her own softball business with Joel and that Alexandra would use the name "Northeast Angels" in her new enterprise. (*Id.*).

Conversely, Plaintiff claims that, without its authorization, Alexandra and Joel created Defendant entity "Northeast Angels Softball, LLC" on June 14, 2022 and used that entity to proceed with the purchase of the Suffern facility. (ECF No. 6, at 8.) Plaintiff alleges the following information and inferences associated with Defendants' June transactions:

- Defendants planned to use the Suffern facility in association with the Northeast Angels without NES's consent or authorization. Moreover, without NES's investment, Defendants lacked the funds to complete either the purchase or the construction of the Suffern facility.

- Around June of 2022, Defendants began requesting that they be able to take over responsibility for collecting player dues. Sources familiar with those transactions later informed NES that Defendants had intended to rely on Northeast Angels' player dues to finance the Suffern facility.

- Alexandra could only finance the Suffern facility if she maintained her position at NES until the new season was set to begin, and then use the access and authority that had been provided to her through that position to seize control of the Northeast Angels from NES. (ECF No. 6, at 8-9.)

Defendants do not dispute the creation of the "Northeast Angels Softball, LLC" entity. However, they state that, on June 15, 2022, Joel sent an email to Plaintiff notifying Plaintiff of Defendant's plans to establish a new softball facility and its own teams. (ECF No. 14, at 12.)  In this email, Joel notifies Plaintiff that Defendants have acquired a lease on the Suffern facility and that they intend to continue their working relationship with Plaintiff. (ECF No. 14-1, at 3.) Joel also writes that Defendants plan to implement a new scheduling and payment system for Defendants' facility and teams before July 25th, but notes that other business, such as town team clinics, will remain with Plaintiff and continue to be run through "eSoft," Plaintiff's secure database and planning/payment system. (*Id.*)

Defendant further alleges that, in text messages exchanged on July 26 and 27 of 2022, Plaintiff's owner Mike Monico "confirmed his understanding that softball was now under the

6

umbrella of Defendants' company, Northeast Angels L.L.C." (ECF No. 14, at 13.) Contrary to Defendant's account, Plaintiff states that it was surprised by Joel's announcement on August 4, 2022 that Alexandra had resigned, effective August 1, 2022. (ECF No. 6, at 9.) Despite that resignation, Plaintiff alleges that Alexandra continued to access and download NES's confidential customer information, with her final access occurring on August 12, 2022. (*Id.*) Defendants dispute this characterization. They describe the "database" as a booking system that contained players addresses and functioned as a calendar to schedule training, reserve batting cage time, reserve Plaintiff's gym, and reserve field space. (ECF No. 14, at 13.) Further, Defendants claim Alexandra stopped accessing Plaintiff's database/system on August 8 when Plaintiff blocked her access and that, during August, Alexandra used Plaintiff's database/system solely for the scheduling of private lessons. (*Id.*)

On August 13, 2022, the day after Plaintiff alleges Alexandra ceased accessing its database, Defendants circulated a "Dues Letter" for the Northeast Angels' 2022-2023 season. (ECF no. 6, at 9.) That document did not mention Alexandra's resignation from Plaintiff, but contained a schedule, a link for uniform purchases at "https://spirit.3n2sports.com/#ne-angels-softball", and a registration link for payment of dues to "Northeast Angels Softball, LLC," which displayed the Northeast Angels' logo but was now directed to a bank account controlled by Defendants. (*Id.* at 10.)

Defendants promoted their enterprise using the Northeast Angels' social media account to post messages bearing the Northeast Angels' stylized name and logo. (*Id.*) Defendants also provided players with uniforms bearing the Plaintiff's "NES" logo. (*Id.*)

Plaintiff further alleges that, on October 18, 2022, the parent of a Northeast Angels' player informed NES that the opening of Defendants' Suffern facility is imminent. (*Id.*) Plaintiff expects

that Northeast Angels players will begin training at Defendants' new facility in the coming weeks. (*Id.*)

## PROCEDURAL HISTORY

On October 25, 2022, Plaintiff filed its Complaint against Northeast Angels Softball, LLC, Alexandra Yoffee, and Joel Yoffee, alleging claims for trademark infringement, false representation, and unfair competition, among others. (ECF No. 1.) Plaintiff also filed an application for a temporary restraining order and order to show cause for a preliminary injunction hearing (the "Application"), seeking to enjoin Defendants' from using both the Marks over which its claims ownership and any confidential trade information Defendants allegedly misappropriated from Plaintiff. (ECF No. 6.) Defendants opposed Plaintiff's Application. (ECF No. 14.)

On November 16, 2022, the Court held a show cause hearing for Plaintiff's Application; at the hearing's conclusion, the Court reserved judgment on the Application (Minute Entry dated November 16, 2022.) The Court now addresses Plaintiff's Application.

## LEGAL STANDARD

The Court applies the same standard to applications for a preliminary injunction and a temporary restraining order. *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992) (the "standards which govern consideration of an application for a temporary restraining order [] are the same standards as those which govern a preliminary injunction.").

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  "A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make

them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)).

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009); *see Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, 468 F. App'x 43, 45 (2d Cir. 2012). "To satisfy the irreparable harm requirement, Plaintiff[ ] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faively*, 559 F.3d at 118 (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991).

## **DISCUSSION**

## I.      **Irreparable Harm and Likelihood of Success: Trademark Infringement**

As discussed, Plaintiff claims that it will suffer irreparable harm in the absence of its proposed preliminary injunction for two main reasons. First, Plaintiff alleges that Defendants are infringing on the Marks (ECF No. 5, at 1; ECF No. 6, at 12-13.) Second, Plaintiff alleges that Defendants misappropriated trade secrets that they will likely use to steal existing and prospective clients from Plaintiff when they open a competing softball facility imminently. (ECF No. 6, at 13-

14.) The Court first turns to Plaintiff's claim that it will suffer irreparable harm due to Defendants'

alleged infringement of the Marks.

### A.  Legal Standard for Irreparable Harm in a Trademark Infringement Claim

Irreparable harm exists in a trademark case "when the party seeking the injunction shows

that it will lose control over the reputation of its trademark pending trial," because a loss of

reputation is "not calculable nor precisely compensable." *Power Test Petroleum Distribs., Inc. v.

Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985). After the enactment of the Trademark

Modernization Act of 2020, a plaintiff seeking a preliminary injunction is entitled to a rebuttable

presumption of irreparable harm upon a court's finding of a likelihood of success on the merits. 15

U.S.C. § 1116(a); *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 300 (S.D.N.Y.

2021). Therefore, "if (1) the plaintiff establishes that it has a likelihood of success on the merits

(that is, it establishes both the validity of its mark and a likelihood of confusion), and (2) the

defendant fails to rebut the presumption, the plaintiff satisfies its burden of showing irreparable

harm." *Id.*

The Lanham Act (the "Act") protects both registered and unregistered trademarks, as well

as trade dress. *See* 15 U.S.C. § 1114(1)(a)-(b) (protecting registered trademarks from, among other

things, unauthorized use in commerce); 15 U.S.C. § 1125(a)(1)(A) (protecting unregistered marks

by imposing liability for the commercial use of "any word, term, name, symbol, or device, or any

combination thereof, or any false designation of origin, false or misleading description of fact, or

false or misleading representation of fact, which ... is likely to cause confusion, or to cause

mistake"). Courts analyze trademark infringement claims brought under the Act using a two-step

test that asks, "first whether the mark 'merits protection' and, second, whether the allegedly

infringing use of the mark (or a similar mark) is likely to cause consumer confusion." *Victorinox*

*AG v. B&F Sys., Inc.*, 709 F. App'x 44, 47 (2d Cir. 2017), as amended (Oct. 4, 2017) (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 224 (2d Cir. 2012) (internal quotations omitted)).

### B.  Plaintiff Owns the Marks

As an initial matter, however, a Plaintiff must allege ownership over an unregistered trademark to properly state a claim for trademark infringement. *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007). A plaintiff can demonstrate ownership over an unregistered trademark by showing that it was "the first to use a particular mark to identify his goods or services in a given market." *Id. See also La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974) (noting that ownership goes to "[t]he user who first appropriates the mark obtains on enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially"). To establish ownership through prior and continuous use, "the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory." *Id.* at 1271-72.

Here, it is undisputed that Plaintiff made the first prior use of the "NES" and "Northeast Supreme" marks in connection with their baseball and softball operations and that their use was deliberate and continuous for at least two years.  However, the parties dispute whether Plaintiff or Defendant Alexandra owns the "Northeast Angels" marks.

Although it is undisputed that the "Northeast Angels" marks were used for the past two years to identify the Northeast Angels softball teams, the parties dispute ownership of the "Northeast Angels" marks over this period. Plaintiff alleges that the "Northeast Angels" marks were used for the purpose of giving Plaintiff greater significance in the softball world, that it

11

participated in the creation of the "Northeast Angels" marks and bore the monetary costs associated with promoting them, and that Alexandra was Plaintiff's employee when the marks were created. (ECF No. 18, at 3-4.)  Conversely, Defendants allege that: (1) Alexandra was the sole creator of the "Northeast Angels" marks; (2) Alexandra created the marks as an independent contractor; (3) there was an oral agreement between the parties that Plaintiff and Alexandra would share a 50% ownership interest in any work product Alexandra created; (4) there was also an oral agreement that Alexandra would be a 50% owner with Plaintiff in the softball division (and share profits equally); and (5) Plaintiff agreed that team fees would cover operating costs and that it would split any additional profits equally with Alexandra after such costs were paid. (ECF No. 14, at 7.)

The evidence provided to the Court indicates that the "Northeast Angels" marks were first created and then used to identify and promote Plaintiff's softball division. For instance: (1) the Northeast Angels teams were promoted through the "NES Softball Academy" social media page and, at one point in connection with this promotion, Defendant Joel Yoffee refers to the Northeast Angels team and training program as "NES softball"; (2) a press release for the Northeast Angels describes the addition of a coach "to our Angels/NES staff"; (3) Northeast Angels tryouts were held in the NES baseball and softball facility; (4) the "NES" logo is printed on the sleeves of "Northeast Angels" jerseys; and (5) David Fierro, the coach of the "Jersey Girls" team that became the first "Northeast Angels" team, states in his Declaration that his team "joined NES and became the Northeast Angels" and that he "brought [his] Jersey Girls team into NES's softball program." (ECF No. 20, at ¶¶2-5; ECF Nos. 19-4, 19-5, 19-6 and 19-7.) Given that the pertinent question for ownership is whether a party was "the first to use a particular mark to identify [its] goods or services in a given market," and that Plaintiff did so, the Court finds that Plaintiff owns the "Northeast Angels" marks. *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495

F.2d at 1271. Thus, it is unnecessary for the Court to address the parties' other disputed points, such as whether Alexandra was the sole creator of the "Northeast Angels" marks.

### C.  Plaintiff's Unregistered Trademarks Merit Protection

As noted above, the first step in the test for trademark infringement asks whether the marks at issue merit protection. Where, as here, a plaintiff alleges infringement of unregistered trademarks, "the burden is on [the] plaintiff to prove that its mark is a valid trademark." *Franklin v. X Gear 101, LLC*, 2018 WL 3528731, at *11 (S.D.N.Y. July 23, 2018) (quoting *Reese Publ'g Co. v. Hampton Int'l Commc'ns, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980)), *report and recommendation adopted*, 2018 WL 4103492 (S.D.N.Y. Aug. 28, 2018). To determine whether a mark is entitled to protection, a court in this circuit must assess whether a mark is generic, descriptive, suggestive, arbitrary, or fanciful. *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 441 (S.D.N.Y. 2017) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)). "Suggestive and arbitrary or fanciful marks are considered inherently distinctive and protected, but a descriptive mark will be protected only if it has acquired secondary meaning." *Id.* (quoting *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993)). Generic marks, which "are those consisting of words identifying the relevant category of goods or services" have no inherent distinctiveness and are not protectable. *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d at 385; *see, e.g., J.T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883 at *6. "Descriptive marks are those consisting of words identifying qualities of the product." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d at 385. Descriptive marks are inherently weak but may be strong overall "provided they have acquired secondary meaning.'" *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d at 385; *see, e.g., J.T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883 at *6, *15. "Suggestive marks are those that are not directly descriptive but do suggest a quality or qualities of the product, through the use of

'imagination, thought and perception'" and are inherently distinctive. *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d at 385 (citation omitted). Arbitrary or fanciful marks, which "are ones that do not communicate any information about the product either directly or by suggestion," are inherently very distinctive. *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d at 385; *see, e.g., J.T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883 at *7.

Defendants argue that Plaintiff's Marks are trade names that are not entitled to protection, primarily on the basis that there are no "TM" or "R" markings next to the marks at issue that provide notice of trademark rights. (ECF No. 14, 16-17.) Conversely, Plaintiff argues that the marks are, at a minimum, "suggestive," given that "they require imagination, thought and perception to reach a conclusion as to the nature of the goods," and "are stylized, unique designs." (ECF No. 1, at 11); (ECF No. 6 at 10-11.)

The Court concludes that Plaintiff's Marks are "suggestive" and "inherently distinctive," and are therefore protected. Specifically, the "Northeast Angels" name and logo are bolded red, have black borders, and include a haloed "A," (ECF No. 1-2, at 1) and the "NES" and "Northeast Supreme" logos are bolded black, italicized, and set against a gray image of the northeast region of the United States. These marks are suggestive. (ECF No. 1-5, at 2.) Although the "Northeast Angels" mark suggests a softball or baseball relationship (i.e., the Los Angeles Angels are a popular major league baseball team), it requires further thought to imagine that even this mark represents a softball team; moreover, the abbreviation "NES" and name "Northeast Supreme" do not have any clear baseball or softball relationship. *See Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 154 (S.D.N.Y. 2011), *aff'd*, 508 F. App'x 31 (2d Cir. 2013) (concluding that the mark "Bling Bling 2002" was suggestive as applied to gaming equipment or lottery tickets, as "the phrase 'Bling Bling,' when used in connection with these goods conveys some attributes

14

of the product but requires imagination and thought for the consumer to make this connection"). It follows that Plaintiff's marks are also inherently distinctive. In *Star Industries Inc. v. Bacardi & Co.*, for instance, the Second Circuit court found that a stylized design of the letter "O" was "inherently distinctive" (and thereby protected) because it was "stylized with respect to its shading, border, and thickness." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d at 385. Plaintiff's Marks are stylized in each of these respects (and are also stylized through their coloring), which indicates they are similarly inherently distinctive. *See W.B. Roddenbery Co.*, 135 U.S.P.Q. at 216 (holding that a design consisting of a colored circle attached to a differently colored rectangle was inherently distinctive and, therefore, protectable).

Additionally, even if one considers the name "Northeast Angels," generic in the sense that it identifies the relevant product or service due to its potential association with a major league baseball team and the alleged common use of the "Angels" name in the youth softball industry, (ECF No. 14-3, at 6) "there are many examples of legally protected marks that combine generic words with distinctive letters." *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 216 (2d Cir. 2003); *see, e.g., In re Miller Brewing Co.*, 226 U.S.P.Q. 666 (T.T.A.B.1985) (holding that the genericness of the word "LITE" did not render unprotectable Miller's use of the word with distinctive lettering); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560 (Fed.Cir.1987) (logo with generic/descriptive word "SWEATS" beside droplets is a protectable mark). Indeed, given the extent of stylization of Plaintiff's "Northeast Angels" mark, competitors in the Plaintiff's industry are free to use non-stylized forms of the marks or their own different stylizations of the same letters or name, which further supports a finding that Plaintiff's marks are protected. *See Star Indus., Inc. v. Bacardi & Co.*, at 382 (2d Cir. 2005) (noting, "The guiding principle in distinguishing protectable from unprotectable marks is that no one enterprise may be allowed to

attain a monopoly on designs that its competitors may be able to use to effectively communicate information regarding their products to consumers."). Thus, Plaintiff's marks merit protection even though they are unregistered because they are "suggestive" and "inherently distinctive."

### D. Defendant's Alleged Infringement is Likely to Cause Confusion

Once a mark has been found to "merit protection," courts in this Circuit apply the eight-factor balancing test described in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961) to determine whether the alleged infringement is likely to cause confusion. *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016). The Polaroid factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Id.* (quoting *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)). The Court addresses each factor in turn.

#### a. Strength of the Marks

The "strength" of a mark is a measure of "its tendency to identify the goods [or services] sold under the mark as emanating from a particular, although possibly anonymous, source." *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960–61 (2d Cir. 1996). In gauging a mark's strength, a court must consider both the inherent distinctiveness of the mark and the mark's distinctiveness in the marketplace. *See Time*, 173 F.3d at 118. Suggestive marks, such as Plaintiff's marks, are

inherently distinctive. *See Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d, at 385. However, suggestive marks are not necessarily distinct in the marketplace. *See Gameologist*, 838 F. Supp. 2d at 158 ("Although a suggestive mark is entitled to protection without a showing of secondary meaning, suggestiveness is not necessarily dispositive of the issue of the strength of the mark without a showing of secondary meaning."). The burden is on the plaintiff to prove such market distinctiveness with reference to this Circuit's well-established secondary meaning factors: (1) advertising and promotional expenses; (2) consumer studies linking the mark to the source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use. *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987).

The "strength" factor is neutral for Plaintiff. Plaintiff does not allege consumer studies linking the mark to the source, unsolicited media coverage, or specific sales success. although it does claim that it continuously used and promoted the marks over a two-year period. (ECF No. 6, at 7.) *See Gameologist*, 838 F. Supp. 2d at 157-60 (weighing the weakness in demonstrating acquired distinctiveness against the plaintiff and concluding that, despite a relatively strong showing on inherent distinctiveness because of the mark's suggestiveness, the "strength" factor was "at best neutral" for the plaintiff). Thus, Plaintiff satisfies some, but not all, of the relevant distinctives factors, which indicates that the "strength" factor does not favor either party.

### b.  Similarity of the Marks

This factor considers the degree of similarity between the marks used by each party. When analyzing this factor, a court should address "two key questions: (1) whether the similarity between the two marks is likely to cause confusion and (2) what effect the similarity has upon prospective purchasers. *Sports Auth.*, 89 F.3d at 962. In deciding whether the marks are similar as used, [a

court does] not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace." *Id.*

The "similarity" factor clearly favors Plaintiff. "[W]hen the dominant words in two marks are the same, courts have found that their similarity can cause consumer confusion." *Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 294 (S.D.N.Y. 2012). A Second Circuit court has also noted that "[i]t is extremely unusual for the mark of a junior user to include two identical words of a senior user's mark in sequence." *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 330 (2d Cir. 2020). Here, the marks Defendants are using do not simply contain the same words as Plaintiff's Marks – they are identical to Plaintiff's Marks. (ECF No. 1-3, at 2.; ECF No. 1-2, at 2.) This will undoubtedly cause confusion for prospective clients who have associated these marks with Plaintiff for the past two years, particularly as Defendants are using these marks for the same purpose as Plaintiff (i.e., to identify and advertise a softball team and training facility.)

### c. Proximity of the Marks

This factor considers "to what extent the two products compete with each other," accounting for the "market proximity and geographic proximity." *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 134 (2d Cir. 2004). "Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products. Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion." *Id.*

The "proximity" factor also favors Plaintiff. It is undisputed that the Defendants are using Plaintiff's Marks in the same area of commerce (youth softball teams and training), and that they are doing so in the same geographic area where Plaintiff has used the marks for the past two years (the tristate area). (ECF No. 1, at 11.)

### d.  Bridging the Gap

"Bridging the gap refers to the senior user's interest in preserving avenues of expansion and entering into related fields." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir. 1996). This factor involves a determination of the likelihood that the plaintiff will enter the defendants' business or of the average customer's perception that the plaintiff would enter the defendants' market. *See Sports Auth.*, 89 F.3d at 963. Even where both parties are in the same general industry, this factor does not necessarily weigh in the plaintiff's favor. *See, e.g.*, *Brockmeyer*, 248 F. Supp. 2d at 297; *SLY Mag., LLC v. Weider Publ'ns LLC*, 529 F. Supp. 2d 425, 440 (S.D.N.Y. 2007), *aff'd*, 346 F. App'x 721 (2d Cir. 2009). The central question is whether the plaintiff is likely to target the defendants' consumer base. *See Cheddar Bob's Inc. v. Macsnmelts Mgmt. Co.*, No. 16-cv-1331, 2020 WL 1323018, at *10–11 (E.D.N.Y. Jan. 14, 2020).

Here, the "bridging the gap" factor is irrelevant. "When ... the parties' goods are the same, this Polaroid factor is irrelevant because there is no gap to bridge." *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 195 (S.D.N.Y. 2020); *see also Star Indus., Inc.*, 412 F.3d at 387 ("Because ... [the parties'] products are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the Polaroid analysis in this case."). It is undisputed that the parties' goods, namely softball teams and training facilities, are of the same type and function, and that the marks at issue serve to promote these goods. Thus, there is "no gap to bridge." *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 74 (S.D.N.Y. 2021) (noting that the "bridging the gap" factor was irrelevant to the court's analysis of the Polaroid factors because the party's goods were the same).

### e.  Actual Confusion

"[A]ctual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another." *Sports Auth.*, 89 F.3d at 963. "The relevant confusion is that which affects the purchasing and selling of the goods or services in question." *Lang*, 949 F.2d at 583. The Lanham Act is meant to protect "against mistaken purchasing decisions and not against confusion generally." *Id.* In particular, the Lanham Act seeks to avoid "consumer confusion that enables a seller to pass off his goods as the goods of another." *Id.* at 582.

The "actual confusion" factor is, at best, neutral for Plaintiff. Although the confusion alleged is exactly the type that the Lanham Act is meant to protect – a prospective client of Plaintiff's softball program would expect that Plaintiff is associated with a team that uses its marks, and it is undisputed that Defendants advertised their softball team using Plaintiff's "Northeast Angels" marks as well as are using jerseys with the "NES" logo – Plaintiff has not provided specific evidence of confusion. (ECF No. 1-3, at 2; ECF No. 1-2, at 2.) "Courts have concluded that the absence of such evidence may favor the junior user," *Paco Sport, Ltd.*, 86 F. Supp. 2d at 319*; see also Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998) ("[T]he absence of proof of actual confusion, although not dispositive of the question of likelihood of confusion, is a factor favoring defendants."); *Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 362 (S.D.N.Y. 2003), 287 F. Supp. 2d at 374 ("[T]he absence of actual confusion evidence, or of survey evidence showing a likelihood of confusion, dictates that this factor be resolved in defendants' favor."). Plaintiff alleges that prospective clients paid Defendants to participate in Defendants' team, which admittedly uses Plaintiff's marks, but it does not provide any specific evidence that these clients believed Plaintiff remained in control of the Northeast Angels team. (ECF No. 1, at 9.)

  **f. Bad Faith**

This factor looks to whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and whether there exists any confusion between his and the senior user's product." *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (quotation marks omitted).

The "bad faith" factor favors Plaintiff. As noted above, Defendants are using the same marks to promote their softball team and facility that, for the past two years, Plaintiff has used to promote their own softball team and facility. Although Defendants do not claim that they intended to capitalize on the goodwill Plaintiff's Marks carry, it is difficult to imagine that they adopted Plaintiff's Marks for any other purpose than to benefit from the reputation Plaintiff built while using the Marks; Defendants were aware of Plaintiff's Marks before using them and have not offered an alternative reason for adopting the Marks. *See Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 452 (S.D.N.Y. 2008) (noting, "the defendant's awareness of plaintiff's mark may give rise to an inference of bad faith, which is bolstered if the defendant offers no credible explanation for its adoption of the mark").

### g. Quality of the Products

The analysis of the quality of the defendants' product "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener*, 59 F.3d at 398.

Here, the "quality" factor is neutral. On the facts alleged, the Court cannot determine whether Defendant's softball team and new facility are of an inferior quality to Plaintiffs. The Court does not have detailed information about Plaintiff's facility or the facility Defendants are expected to open imminently and, most importantly, the Court possesses no information that would

allow it to accurately determine the quality of Defendants' services. *See Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 308 (S.D.N.Y. 2021) (noting that the "quality" factor was neutral when neither party produced evidence on the quality of the defendants' products)

### h.  Consumer Sophistication

In considering the sophistication of consumers, a court must evaluate "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979). Typically, a greater sophistication of consumers reduces the likelihood of confusion. *Id.* Consumers of relatively inexpensive goods that may be purchased on impulse are generally considered unsophisticated for purposes of this factor. *See Sports Auth.*, 89 F.3d at 965.

This "consumer sophistication" factor weighs in favor of Defendants. The families of serious youth softball players that choose to pay hundreds or thousands of dollars for softball training and team membership are likely not impulsive or inexperienced consumers.[2] They are probably experienced clients of the type of softball services that both parties offer.

### i.  Overall Likelihood of Confusion

Of the eight polaroid factors, three favor Plaintiff: similarity of the marks, proximity of the marks, and bad faith. Four factors have not affected the determination of whether there is a likelihood of consumer confusion: the strength of the marks, bridging the gap, actual confusion, and quality. One factor favors Defendants: consumer sophistication.

In balancing the *Polaroid* factors, the ultimate inquiry is whether the junior's user use of the allegedly infringing mark will confuse consumers. *Guthrie Healthcare Sys.*, 826 F.3d at 37.

---

[2] The alleged total team fee that a player must pay to participate in the 2022-2023 season of Defendant's softball program is $3,200. (ECF No. 1-1, at 2.)

Here, such confusion is likely. Defendants are using the Marks Plaintiff used for two years to advertise the same services (i.e., a travel softball team and softball training facility) Plaintiff offered. It is possible that a former client of Plaintiff that developed a relationship with Defendant Alexandra while she worked for Plaintiff may not be confused, given that such a client may know the parties' severed their relationship. However, on the record developed at this time, a typical consumer of youth softball services would likely assume Plaintiff controls a team that advertises and wears jerseys with marks that Plaintiff used continuously for the previous two years. On this basis, and given that that the net outcome of the Polaroid factors favors Plaintiff, the Court concludes that the alleged infringement of Plaintiff's Marks is likely to cause confusion.

Since Plaintiff's Marks both merit protection and are likely to cause confusion, the Court finds that Plaintiff has a likelihood of success on the merits for its trademark infringement claim. *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 300 (S.D.N.Y. 2021). As such, Plaintiff has established a rebuttable presumption of irreparable harm.

The Court further concludes that Defendant has failed to rebut Plaintiff's presumption of irreparable harm. As discussed above, success on the merits in a trademark infringement case requires that the plaintiff show that its mark is entitled to protection and that defendant's use of the mark is likely to cause confusion. *See Chloe v. Queen Bee of Beverly Hills, LLC*, No. 06 CIV. 3140 RJH, 2011 WL 3678802, at *3 (S.D.N.Y. Aug. 19, 2011). Plaintiff has demonstrated the likelihood of confusion between its marks and Defendants'; therefore, absent a preliminary injunction, "the reputation and goodwill cultivated by [Plaintiff] would be out of its hands." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 521 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013). Accordingly, Plaintiff has established that it will suffer irreparable harm in the absence of a preliminary injunction.

II.     **Likelihood of Success & Irreparable Harm – Misappropriation of Trade Secrets**

    A.  **Likelihood of Success**

        Plaintiff's second argument for why it will suffer irreparable harm in the absence of a preliminary injunction is that Defendants misappropriated trade secrets that they will allegedly use to steal existing and prospective clients from Plaintiff. (ECF No. 6, at 13-14.) The Court first considers whether there is a likelihood of success on the merits as to Plaintiff's claims that Defendant misappropriated its trade secrets.

        The requirements for showing a misappropriation of a trade secret are similar under state and federal law. Under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999). Similarly, under the Defend Trade Secrets Act ("DTSA"), a party must show "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, No. 15CV211LGSRLE, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (quoting 18 U.S.C. § 1839(3) (A)–(B)).

        The Court concludes that Plaintiff is unlikely to succeed on the merits for its misappropriation claim because it has not shown that the information that it alleges Defendants misappropriated qualifies as a trade secret. Courts consider several factors as "guideposts[,]"

which need not all be alleged, in discerning whether information qualifies as a trade secret, including:

> (1) the extent to which the information is known outside of the business; (2) the extent
>
> to which it is known by employees and others involved in the business; (3) the extent
>
> of measures taken by the business to guard the secrecy of the information; (4) the value
>
> of the information to the business and to its competitors; (5) the amount of effort or
>
> money expended by the business in developing the information; (6) the ease or
>
> difficulty with which the information could be properly acquired or duplicated by
>
> others.

*Iacovacci v. Brevet Holdings*, LLC, No. 18-CV-8048, 2020 WL 528059, at *8 (S.D.N.Y. Feb. 3, 2020) (citation omitted).

Here, Plaintiff alleges that Alexandra Yoffee accessed its confidential database of information stored on a password-protected employee account a dozen times over a period of twelve days following her resignation on August 1st (ECF No. 1, at 8.). According to Plaintiff, this database contains "every facet of a player or client's training needs," including details about services used, pricing arrangements received, contact information, and other commercially valuable details. (*Id.*) Defendants dispute this characterization; they assert that the "database" is a booking system that contains players addresses and functions as a calendar to schedule training, reserve batting cage time, reserve Plaintiff's gym, and reserve field space. (ECF No. 14, at 13.) Further, Defendants claim that Alexandra stopped accessing Plaintiff's database/system on August 8, 2022 when Plaintiff blocked her access and that, during early August, Alexandra used Plaintiff's database/system solely for the scheduling of private lessons. (*Id.*) It is, however, undisputed that

the secure information is stored on a server called "eSoft Planner" and that this server is password-protected. (ECF No. 1, at 13.)

Even assuming, *arguendo*, that the database contains the confidential information Plaintiff alleges, Plaintiff is unable to show a likelihood of success on its trade secrets appropriation claim. Perhaps the most valuable information that Plaintiff alleges is secured on its database – player's identities and addresses as well as pricing information – are not considered trade secrets. Under Second Circuit precedent, a customer list "developed by a business through substantial effort and kept in confidence may be treated as a trade secret ... provided the information it contains is not otherwise readily ascertainable." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 46 (2d Cir. 1999); *see also Seven, LLC v. Martinez*, No. 19-CV-7320, 2021 WL 276654, at *7 (S.D.N.Y. Jan. 26, 2021) (noting, "whether a customer list constitutes a trade secret lies in whether the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or, by contrast, the customers are not known in the trade or are discoverable only by extraordinary efforts") (quoting *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 216 (S.D.N.Y. 2013) (internal quotations omitted). "The question of whether or not a customer list is a trade secret is generally a question of fact." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir. 1991). Here, although Plaintiff alleges that the names and addresses of its customers are secured on the eSoft server, these names are "readily ascertainable." Plaintiff's customers are the individuals that play on its softball teams, and their names and addresses are presumably available via google searches (such as from a google search of the Northeast Angels team rosters), are known to other coaches and players within the youth softball community, and are undoubtedly known to Defendant Alexandra, who coached Northeast Angels players for two years. Likewise, although "pricing information may constitute a trade secret under certain circumstances, this is generally

26

where a company uses some type of proprietary formula that gives it a unique advantage, such as a complex pricing or trading algorithm in a financial business." *24 Seven, LLC*, 2021 WL 276654, at \*8 (internal quotation marks and citations omitted). Plaintiff does not allege that it possesses any type of proprietary complex pricing or trading algorithm, any prospective customer could easily inquire about the cost of participating in its teams and training programs, and its pricing information is, of course, known to Defendant Alexandra and Northeast Angels players. Moreover, although Plaintiff also claims that the database contains "detailed information about the services used" and "other commercially valuable details," these allegations are too vague to constitute "trade secrets." *See PaySys International Inc. v. Atos Se*, No. 14-CV-10105, 2016 WL 7116132, at \*10 (S.D.N.Y. Dec. 5, 2016) (identifying trade secrets as "the Products, all Enhancements to the Products and all proprietary information, data, documentation and derivative works related to the products" was insufficiently specific to survive a motion to dismiss); *see also Elsevier Inc. v. Doctor Evidence,* LLC, No. 17-CV-5540, 2018 WL 557906, at \*6 (S.D.N.Y. Jan. 23, 2018) (general references to "clinical methods, process to assess the quality of evidence and how to execute it, and interpretation of data," without explaining "how those methods processes, and interpretations function" did not plausibly allege existence of a trade secret) (internal quotation marks omitted).

**B.  Irreparable Harm**

The Court does not need to address whether Plaintiff will suffer irreparable harm from Defendants' alleged misappropriation of its trade secrets absent a preliminary injunction, as Plaintiff has failed to show that its misappropriation of trade secrets claim is likely to succeed on the merits. *Lake Region Med., Inc. v. Pike*, No. 21-CV-844-LJV, 2021 WL 3700433, at \*5 (W.D.N.Y. Aug. 20, 2021) (finding that, for purposes of a preliminary injunction, Plaintiff was

unable to demonstrate irreparable harm from Defendant's alleged misappropriation of trade secrets and violation of a non-compete clause because Plaintiff was unlikely to succeed on the merits of its claims).

### III.       Balance of the Equities and the Public's Interest

Plaintiff has demonstrated a likelihood of success on the merits for its claims that Defendants are infringing on the Marks. It has also shown that irreparable harm will occur absent a preliminary injunction prohibiting Defendants' use of the Marks. Therefore, the Court must determine whether Plaintiff can demonstrate a balance of the equities in its favor and whether a preliminary injunction against Defendants' use of Plaintiff's Marks is in the public's interest.

However, as Plaintiff has not demonstrated a likelihood of success on the merits for its misappropriation of trade secrets claim, the Court will not address the balance of the equities or public interest in a preliminary injunction with respect to this claim and the alleged conduct underlying it.

### A.  Balance of the Equities

The Court concludes that Plaintiff has shown a balance of the equities in its favor for its trademark infringement claim. In determining whether the balance of the equities tips in the plaintiff's favor, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Further, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

Without a preliminary injunction against Defendants' use of Plaintiff's Marks, Plaintiff will suffer irreparable and unquantifiable harm to its reputation and goodwill. Prospective and

current clients of Plaintiff have grown accustomed to identifying its softball teams and facility with the Marks and would presumably expect Plaintiff to operate a softball team that uses the Marks for advertising and wears the Marks on its jerseys. Such clients would likely feel confused and dissatisfied when they discover that, despite paying hundreds or thousands of dollars to join a softball team that uses Plaintiff's marks, they do not receive the benefits of Plaintiff's facility and other services. Moreover, Defendants' uninhibited use of Plaintiff's marks would prevent Plaintiff from exercising control over the reputation and goodwill associated with them. *See Museum of Mod. Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 383 (S.D.N.Y. 2018) (finding that the balance of the equities was in Plaintiff's favor for purposes of a trademark infringement claim where Defendant's use of a similar mark to Plaintiff's would engender customer confusion and prevent the Plaintiff's ability to control its reputation for the services offered under its name and mark).

Defendants' hardships are of a different character. They will consist primarily of the economic costs of changing the names of their organization and softball teams, which may involve purchasing new jerseys as well as changing the names and logos on any advertisement products, as opposed to the unquantifiable costs associated with the loss of an established reputation and goodwill. *Id.* (noting that Defendant's economic burden of changing the name and logo on its website, promotional materials, café items, and social media platforms was quantifiable and compensable); *see also Diesel Props S.R.L. v. Greystone Business Credit II LLC*, No. 07-CV-9580 (HB), 2008 WL 594773, at *5 (S.D.N.Y. Mar. 5, 2008) (finding that the plaintiffs' unquantifiable injuries outweigh the defendants' quantifiable injuries). Thus, the balance of the equities weighs decidedly in Plaintiff's favor for purposes of their request for a preliminary injunction against Defendants' use of the Marks.

**B.  The Public's Interest**

The Court likewise concludes that Plaintiff's request for a preliminary injunction against Defendants' use of the Marks is in the public's interest. "The consuming public has a protectable interest in being free from confusion, deception and mistake." *U.S. Polo Ass'n*, 800 F.Supp.2d at 541; *see also ProFitness Physical Therapy Ctr., v. Pro-Fit Orthopedic & Sports Physical Therap P.C.*, 314 F.3d 62, 68 (2d Cir. 2002) (noting that it is well established that there is a "strong interest in preventing public confusion"). Accordingly, the public would be served by ending that confusion. *See Juicy Couture, Inc. v. Bella Intern, Ltd.*, 930 F. Supp. 2d 489, 505 (S.D.N.Y. 2013) (finding that Plaintiff demonstrated that the defendants' actions are likely to cause consumer confusion and that, in consequence, the public interest would not be disserved by the issuance of a preliminary injunction). As discussed, Defendants' use of Plaintiff's Marks to identify and advertise their softball team and services will lead to consumer confusion and prevent Plaintiff from exercising control over its reputation. This indicates that it is in the public interest to issue a preliminary injunction that prohibits Defendants' use of Plaintiff's marks.

<u>**CONCLUSION**</u>

For the reasons stated above, Plaintiff's application for a preliminary injunction is DENIED in Part and GRANTED in part. Specifically, it is hereby ORDERED that Defendants are enjoined forthwith from:

- using any reproduction, counterfeit, copy, or colorable imitation of Plaintiff's Marks to identify any goods or services not authorized by Plaintiff;

- using any of Plaintiff's Marks including, without limitation, Plaintiff's Marks, or any other marks that are confusingly or substantially similar to Plaintiff's Marks, on or in connection with Defendants' advertising, marketing, promoting,

distributing, displaying, selling, dealing in, or otherwise participating in sporting

events, goods, services, or entities bearing Plaintiff's marks; and

- reproducing, counterfeiting, copying, or colorably imitating Plaintiff's Marks and applying such reproductions, counterfeits, copies, or colorable imitations to digital images, labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or service.

The Court has considered all the arguments raised by the parties, and those arguments not specifically addressed are without merit.

Dated:   December 2, 2022                              SO ORDERED:
         White Plains, New York

                                          _____ __
                                               NELSON S. ROMÁN
                                            United States District Judge

31